FILED
CLERK
11/25/2015 12:38 pm
U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
EDF RENEWABLE DEVELOPMENT, INC.,

        Plaintiff,

   -against-

TRITEC REAL ESTATE COMPANY, INC.,

        Defendant.
----------------------------------------------------------X

**OPINION & ORDER**
**15-CV-0123 (SJF)(GRB)**

FEUERSTEIN, J.

I.    Introduction

On January 9, 2015, plaintiff EDF Renewable Development, Inc. ("plaintiff") commenced this action against defendant Tritec Real Estate Co., Inc. ("defendant") pursuant to this Court's diversity of citizenship jurisdiction under 28 U.S.C. § 1332(a), seeking, *inter alia*, damages for defendant's purported tortious interference with a contract between plaintiff and the County of Suffolk ("the County"). Pending before the Court is defendant's motion to dismiss the complaint pursuant to, *inter alia*, Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim for relief. For the reasons set forth below, the branch of defendant's motion seeking dismissal of the complaint as barred by the Noerr-Pennington doctrine is granted and the complaint is dismissed in its entirety with prejudice.

II.    Background

    A.    Factual Background[1]

---

[1] The factual allegations are taken from the complaint and are assumed to be true for purposes of this motion only. They do not constitute findings of fact by the Court.

1

Plaintiff is a Delaware corporation with its principal place of business in California, (Complaint ["Compl."], ¶ 3), and "is a project developer with extensive experience in the renewable energy industry." (Id.)

Long Island Solar ("LIS") is a Delaware limited liability company with its principal place of business in California. (Compl., ¶ 4). At all relevant times, plaintiff owned one hundred percent (100%) of the membership interests in LIS. (Id.) Pursuant to a Purchase and Sale Agreement dated November 6, 2012 (the "Sale Agreement"), (a) an affiliate of plaintiff sold all membership interests in LIS to CD NY Solar 1 LLC; and (b) LIS assigned its right to the claims asserted in this case to plaintiff. (Id.)

Defendant is a New York corporation with its principal place of business in Suffolk County, New York, (Compl., ¶ 5), and is a real estate, development and construction company. (Id.)

In or around 2008, the Long Island Power Authority ("LIPA") awarded plaintiff the contract for a project "for solar photovoltaic power installations on Long Island[,]" (Compl., ¶¶ 9-10), pursuant to which plaintiff "proposed options for developing smaller power installations at numerous sites, which would be aggregated to satisfy LIPA's request and to support the LIPA power grid." (Id., ¶ 11). According to plaintiff, Suffolk County collaborated with it and LIS to use County-owned parking lots for the power installations ("the carport installations"), (id., ¶ 13), and the proposed project was planned to cover seven (7) sites. (Id., ¶ 16).

In January 2010, LIS entered into a twenty (20)-year contract with LIPA for the sale of electricity produced by the carport installations (the "Power Purchase Agreement"), (Compl., ¶ 14), which included (i) a deadline by which the solar installations were to be completed; and (ii)

2

penalties in the event of a failure to build all planned installations. (Id., ¶ 15).

According to plaintiff, Suffolk County enacted resolution No. 28-2010 authorizing former Suffolk County Executive Steven Levy ("Levy") to enter into leases with LIS "to facilitate the use of the County parking facilities for the construction and operation of solar energy facilities." (Compl., ¶ 17). On March 22, 2010, LIS and the County entered into seven (7) separate lease agreements "for the installation and operation of solar carport facilities on Suffolk County-owned property" at specific locations, including at the Ronkonkoma Long Island Railroad Station ("the Ronkonkoma Site"), for twenty (20)-year periods. (Id., ¶¶ 2, 18, 21). According to plaintiff, the Ronkonkoma Site is the largest of the seven (7) leased sites and comprised almost one-third (1/3) of the total project size. (Id., ¶¶ 2, 20).

Plaintiff alleges that Section 35.02 of the lease pertaining to the Ronkonkoma Site (the "Lease") provides that:

> "[t]he County shall fully support and cooperate with [LIS] in the conduct of its operations and the exercise of its rights under this Agreement [including with [LIS's] efforts] to (a) obtain from any Governmental Authority or any other person or entity any . . . permit . . . ."

(Compl., ¶ 23) (third brackets in original; emphasis omitted)[2].

According to plaintiff, defendant "was fully aware of the Ronkonkoma Lease . . . because [it] had obtained a copy of the Lease pursuant to New York State's Freedom of Information Law." (Compl., ¶ 24).

By the end of 2011, Suffolk County had issued building permits to LIS for five (5) of the

---

[2] Plaintiff does not attach a copy of the Lease to the complaint but this allegation, like all of the other factual allegations in the complaint, is presumed to be true for purposes of this motion only.

3

seven (7) project sites, (Compl., ¶ 26), exclusive of the Ronkonkoma Site and a site in Deer Park, for which LIS had not yet submitted full building permit packages.[3]  (See id., ¶¶ 27-28).

Plaintiff alleges, *inter alia*, (1) that defendant "is the developer of the 'Ronkonkoma Hub,' a project in close proximity to the Ronkonkoma [Site] . . .[,]" (Compl., ¶ 30); (2) that prior to January 2012, defendant had unsuccessfully "attempted to get [Levy] to breach the Ronkonkoma Lease by not allowing [plaintiff's] construction of the solar carports at the Ronkonkoma site[,]" (id., ¶ 32); and (3) that after Steven Bellone ("Bellone") replaced Levy as the Suffolk County Executive in January 2012, defendant (a) "promptly renewed its efforts to interfere with the Ronkonkoma Lease. . .[,]" (id., ¶ 33), and (b) "had a meeting with Suffolk County officials, including Mr. Bellone, in order to pressure and persuade Suffolk County not to permit [plaintiff's] installation of the solar carports at the Ronkonkoma [S]ite."[4]  (Id., ¶ 34). According to plaintiff, defendant's

> "decision to meet with Mr. Bellone shortly after he assumed office as the new Suffolk County Executive was specifically calculated to maximize [its] chance of persuading Suffolk County to breach the Ronkonkoma Lease.  Specifically, [defendant] believed that it had a better chance of convincing Mr. Bellone not to permit the solar carports at the Ronkonkoma [S]ite because he was new to the post of County Executive and was still unfamiliar with [plaintiff's] solar project and the Ronkonkoma Lease."

(Compl., ¶ 35).

Plaintiff alleges that "[a]t, or shortly after the January 2012 meeting" (1) defendant

---

[3] A building permit was issued for the site in Deer Park on March 7, 2012.  (Compl., ¶ 28).  Accordingly, six (6) of the seven (7) sites "now have solar carport facilities in operation." (Id., ¶ 29).

[4] Based upon the allegations in the complaint, LIS had not yet submitted "the full building permit package" for the Ronkonkoma Site at the time of defendant's meeting with Bellone.  (See Compl., ¶¶ 27, 33-34).

4

persuaded Suffolk County not to permit [plaintiff's] solar project at the . . . Ronkonkoma [Site][,]" (id., ¶ 36); (2) the County "decided not to issue the building permit for the Ronkonkoma [S]ite as it had promptly done for all the other sites[,]" (id., ¶ 37); (3) the County stopped "fully support[ing] and cooperat[ing]" with plaintiff regarding the building permit for the Ronkonkoma Site, (id., ¶ 38); and (4) "Suffolk County officials successfully devised a plan to 'stall' [plaintiff's] building permit application for the Ronkonkoma [S]ite by instructing County employees involved in the permitting process not to respond to [plaintiff's] inquiries regarding the building permit for the Ronkonkoma [S]ite." (Id., ¶ 39).

On or about February 14, 2012, after defendant's meeting with Bellone, LIS submitted "the full building permit package" for the Ronkonkoma Site. (Compl., ¶ 27). On or about February 16, 2012, LIPA informed LIS that "it had been advised that Suffolk County would not honor the Ronkonkoma Lease and would not issue the building permit for the Ronkonkoma [S]ite." (Id., ¶ 40).

On March 2, 2012, LIS met with representatives of the County, who informed it "that, notwithstanding the Ronkonkoma Lease, Suffolk County intended to refuse to allow the solar carports at the Ronkonkoma [S]ite." (Compl., ¶¶ 41-42). According to plaintiff, thereafter LIS "repeatedly requested the issuance of the permit for the Ronkonkoma [S]ite, but received no response from Suffolk County." (Id., ¶ 46).

Plaintiff alleges: (1) that "[d]ue to Suffolk County's refusal to issue the building permit for the Ronkonkoma [S]ite, which was a direct result of [defendant's] intentional and malicious interference with the Ronkonkoma Lease, it became impossible for [LIS] to build the Ronkonkoma [S]ite as required by the Power Purchase Agreement[,]" (Compl., ¶ 48); and (2)

5

that as a result thereof, it sustained damages (a) in excess of ten million dollars ($10,000,000.00) for the "direct costs of the physical equipment [it] ordered for the Ronkonkoma [S]ite, including steel and solar panels," (Compl., ¶ 51), (b) in excess of two million dollars ($2,000,000.00) for "development costs, professional fees, and project management fees attributable to the Ronkonkoma [S]ite," (id., ¶ 52), (c) for lost profits "because it was not able to obtain the income that LIPA would have paid for the electricity that was to be produced by the solar carports at the Ronkonkoma [S]ite[,]" (id., ¶ 53), and (d) for attorney's fees and expenses it incurred it connection with a lawsuit it was "forced to file" against the County for breach of contract because of defendant's interference with the Lease. (Id., ¶ 54).

B.  Procedural History

On January 9, 2015, plaintiff commenced this action against defendant pursuant to this Court's diversity of citizenship jurisdiction under 28 U.S.C. § 1332(a), seeking, *inter alia*, damages for defendant's purported tortious interference with the Lease. Specifically, plaintiff alleges, *inter alia*, that the Lease was a valid contract between it and the County of which defendant had actual knowledge, (Compl., ¶ 56); that the County breached the Lease by refusing to issue plaintiff a building permit for, and to allow construction of the solar carports at, the Ronkonkoma Site, (id., ¶ 57); that defendant intentionally procured the County's breach of the Lease, (id., ¶ 58); that defendant's "intentional interference with the Ronkonkoma Lease was willful and malicious in that it evinces a wanton or reckless disregard for [plaintiff's] rights[,]" (id., ¶ 59); and that plaintiff has suffered damages of not less than twelve million five hundred thousand dollars ($12,500,000.00), together with interest. (Id., ¶ 60).

Defendant now moves to dismiss the complaint pursuant to, *inter alia*, Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim for relief.

III.   Discussion

   A.   Standard of Review

The standard of review on a motion made pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure is that a plaintiff plead sufficient facts "to state a claim for relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009). The plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully." Id.

"A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" Iqbal, 556 U.S. at 678, 129 S. Ct. 1937 (quoting Twombly, 550 U.S. at 555, 127 S. Ct. 1955). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" Id. (quoting Twombly, 550 U.S. at 557, 127 S. Ct. 1955). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Twombly, 550 U.S. 544, 127 S. Ct. at 1959.

In deciding a motion pursuant to Rule 12(b)(6), the Court must liberally construe the claims, accept all factual allegations in the complaint as true, and draw all reasonable inferences

in favor of the plaintiff. See Aegis Ins. Servs., Inc. v. 7 World Trade Co., L.P., 737 F.3d 166, 176 (2d Cir. 2013); Grullon v. City of New Haven, 720 F.3d 133, 139 (2d Cir. 2013). However, this tenet "is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678, 129 S. Ct. 1937. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." Id. at 679, 129 S. Ct. 1937. "In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." Id.; see also Ruston v. Town Bd. for Town of Skaneateles, 610 F.3d 55, 59 (2d Cir. 2010).

Nonetheless, a plaintiff is not required to plead "specific evidence or extra facts beyond what is needed to make the claim plausible." Arista Records, LLC v. Doe 3, 604 F.3d 110, 120-1 (2d Cir. 2010); accord Pension Benefit Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc., 712 F.3d 705, 729-30 (2d Cir. 2013). "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Iqbal, 556 U.S. at 679, 129 S. Ct. 1937.

In deciding a motion pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must limit itself to the facts alleged in the complaint, which are accepted as true; to any documents attached to the complaint as exhibits or incorporated by reference therein; to matters of which judicial notice may be taken; or to documents upon the terms and effect of which the complaint "relies heavily" and which are, thus, rendered "integral" to the complaint. Chambers v. Time Warner, Inc., 282 F.3d 147, 152-53 (2d Cir. 2002); see also ASARCO LLC v. Goodwin, 756 F.3d 191, 198 (2d Cir. 2014), cert. denied, 135 S. Ct. 715, 190 L. Ed. 2d 441 (2014).

B. The Noerr-Pennington Doctrine

Defendant contends that plaintiff's tortious interference claim is barred by the Noerr-Pennington doctrine and First Amendment principles.

Where, as here, "a plaintiff claims the defendant tortiously interfered with a [contract] by lobbying a governmental entity, courts applying New York law analyze the First Amendment issue under the Noerr-Pennington doctrine."[5]  Friends of Rockland Shelter Animals, Inc. (FORSA) v. Mullen, 313 F. Supp. 2d 339, 343 (S.D.N.Y. 2004); see also Fox News Network, L.L.C. v. Time Warner Inc., 962 F. Supp. 339, 345 (E.D.N.Y. 1997) (holding that in order to protect the First Amendment right to petition the government for a redress of grievances, "the courts have adopted the Noerr-Pennington doctrine, prohibiting suits where the challenged activity involves lobbying." (quotations and citation omitted)); Hamilton v. Accu-tek, 935 F. Supp. 1307, 1316 (E.D.N.Y. 1996) ("Under what is known as the Noerr-Pennington doctrine, many actions under various antitrust or tort theories against businesses or individuals are prohibited where the challenged activity involves lobbying, despite the defendant's anticompetitive purpose or otherwise injurious purpose or effect.")  "The Noerr-Pennington doctrine refers to a trilogy of Supreme Court cases, Eastern R.R. Presidents Conference v. Noerr Motor Freight, 365 U.S. 127, 81 S. Ct. 523, 5 L. Ed. 2d 464 (1961), United Mine Workers v. Pennington, 381 U.S. 657, 85 S. Ct. 1585, 14 L. Ed. 2d 626 (1965), and California Motor Transp. Co. v. Trucking Unlimited, 404 U.S. 508, 92 S. Ct. 609, 30 L. Ed. 2d 642 (1972), holding that activities attempting to influence legislative, executive, administrative or judicial action to

---

[5] "Lobbying" in this context means "try[ing] to influence [] a political decision-maker[] . . . ." Lobby, Black's Law Dictionary (10th ed. 2014).

9

eliminate competition are wholly immune from federal antitrust liability unless the conduct falls within the 'sham exception' to the doctrine." Suburban Restoration Co., Inc. v. ACMAT Corp., 700 F. 2d 98, 99 (2d Cir. 1983); accord FORSA, 313 F. Supp. 2d at 343; see also Bath Petroleum Storage, Inc. v. Market Hub Partners, L.P., 129 F. Supp. 2d 578, 592 (W.D.N.Y. 2000), aff'd, 229 F.3d 1135 (2d Cir. 2000) (summary order) ("The Noerr-Pennington doctrine provides that activities directed toward influencing governmental action, such as litigation and lobbying, are immunized from antitrust liability, unless such activities are shown to be a mere sham.")

"Lobbying activities fall within the 'sham exception' when 'they are found to be a "sham" to disguise what is otherwise nothing more than an attempt to directly injure a competitor and the political actor has no real interest in the outcome.'" FORSA, 313 F. Supp. 2d at 343 (quoting Hamilton, 935 F. Supp. at 1317); see also Alfred Weissman Real Estate, Inc. v. Big V Supermarkets, Inc., 268 A.D.2d 101, 109, 707 N.Y.S.2d 647 (N.Y. App. Div. 2000) ("The 'sham' exception to the Noerr-Pennington doctrine comes into play when the party petitioning the government is not at all serious about the object of the petition, but does so merely to inconvenience its competitor, or to preclude or delay its competitor's access to governmental processes.") "A 'sham' situation involves a defendant whose activities are not genuinely aimed at procuring favorable governmental action at all, . . . not one who genuinely seeks to achieve his governmental result, but does so through improper means[.]" City of Columbia v. Omni Outdoor Advert., Inc., 499 U.S. 365, 380, 111 S. Ct. 1344, 113 L. Ed. 2d 382 (1991) (quotations and citations omitted). "[B]y definition, a 'successful effort to influence government action' cannot be considered a sham." Hamilton, 935 F. Supp. at 1317 (quoting Professional Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc., 508 U.S. 49, 58, 113 S. Ct. 1920, 123 L. Ed. 2d 611

10

(1993)); accord Alfred Weissman, 268 A.D.2d at 110, 707 N.Y.S.2d 647.

Although "[o]vertly corrupt conduct, such as threatening or bribing a public official, has also been ruled to be outside the protection of the [Noerr-Pennington] doctrine[,]" FORSA, 313 F. Supp. 2d at 343, "lobbying activities that are unethical or result in deception are not actionable under the Noerr-Pennington doctrine." Id. at 344; see also Alfred Weissman, 268 A.D.2d at 107, 707 N.Y.S.2d 647 ("[C]ourts have upheld the application of the doctrine even when the petitioning activity included the use of questionable or underhanded activity.") "[T]he 'corruption' exception[]. . . applies only where a party has stepped beyond the bounds of zealous advocacy and engages in conduct alleged to be criminal, not just deceptive or unethical[.]" Alfred Weissman, 268 A.D.2d at 110, 707 N.Y.S.2d 647.

Since "an important policy behind the Noerr-Pennington doctrine is the need to protect the right of the people to participate in the political process, the doctrine is an application of the [F]irst [A]mendment[] . . . [and] is relevant outside the context of antitrust actions." FORSA, 313 F. Supp. 2d at 343; see also Hamilton, 935 F. Supp. at 1316 (holding that the Noerr-Pennington doctrine "developed in large part to protect the First Amendment right to petition government.") "Accordingly, courts apply the Noerr-Pennington doctrine to state law claims for tortious interference." FORSA, 313 F. Supp. 2d at 343; see also Bath Petroleum, 229 F.3d at * 1 (holding that Noerr-Pennington immunity is applicable to state law claims for tortious interference); Fox News, 962 F. Supp. at 345 ("The doctrine originated as a limit on antitrust liability, but has been used to prohibit other types of proceedings, including. . . tortious interference claims." ); Concourse Nursing Home v. Engelstein, 278 A.D.2d 35, 35, 717 N.Y.S.2d 154 (N.Y. App. Div. 2000) ("Although the Noerr-Pennington doctrine initially arose in

11

the antitrust field, the courts have expanded it to protect First Amendment petitioning of the government from claims brought under Federal and State law, including . . . common-law tortious interference with contractual relations [claims]." (quoting Alfred Weissman, 268 A.D. 2d at 107, 707 N.Y.S.2d 647)).

Contrary to plaintiff's contention, defendant's meeting with Bellone regarding the issuance of a building permit to plaintiff for the Ronkonkoma Site was not merely a private activity. Rather, based upon the allegations in the complaint, the very purpose of the meeting was to "pressure," "persuade" and "convinc[e]" the County, through Bellone, not to issue a building permit to LIS and/or plaintiff allowing installation of the solar carports at the Ronkonkoma Site, (Compl., ¶¶ 34-36), or, in other words, to attempt to influence a political decision-maker of the County, i.e., Bellone, regarding the performance of a governmental function, i.e., the issuance of a building permit. Such conduct clearly constitutes lobbying within the meaning of the Noerr-Pennington doctrine. See, e.g. FORSA, 313 F. Supp. 2d at 343 (finding that the defendant's letter to the County Executive of Rockland County requesting that he reconsider his decision to recommend approval of a resolution granting the plaintiff the contract to run an animal shelter on premises leased from the County of Rockland was "an attempt to influence the government within the meaning of the Noerr-Pennington doctrine" and, thus, was not actionable unless the defendants' actions fell within the "sham exception" or were overtly corrupt); Hamilton, 935 F. Supp. at 1321 ("Defendants' efforts to affect federal firearm policies through lobbying activities are prime examples of the types of activity the First Amendment, through its rights of free speech and petition, sought to protect. . . . Lobbying before either federal or state authorities [is] not tortious.")

Since plaintiff alleges, *inter alia*, that defendant acted because it "was concerned that [plaintiff's] planned solar project for the Ronkonkoma [S]ite could be incompatible with the Ronkonkoma Hub that [it] was developing," (Compl., ¶ 31), and not solely to damage plaintiff, the "sham exception" to the Noerr-Pennington doctrine is inapplicable. See, e.g. FORSA. 313 F. Supp. 2d at 343-44 (finding that the "sham exception" did not apply because the plaintiff's interference claim was premised on the contention that the defendants acted in order to help [plaintiff's competitor to] remain in business, and not solely to damage the plaintiff); Alfred Weissman, 268 A.D.2d at 108, 707 N.Y.S.2d 647 (finding that since the plaintiff "failed to allege that the defendants' activities were perpetrated *only* for reasons other than legitimate petitioning of the government, . . . [it] ha[d] not alleged conduct outside the protections of the Noerr-Pennington doctrine. . . ." (emphasis in original; citation omitted)). Moreover, since plaintiff attributes the County's failure to issue it a building permit for the Ronkonkoma Site to defendant's conduct in meeting with and influencing Bellone, (see Compl., ¶¶ 36-37), defendant's conduct cannot be considered a "sham." See, e.g. Villanova Estates, Inc. v. Fieldston Prop. Owners Ass'n, Inc., 23 A.D.3d 160, 161, 803 N.Y.S.2d 521 (N.Y. App. Div. 2005) ("[S]ince plaintiff attributes the City Council's disapproval of its [land use] application to [the] defendants' activities, th[o]se activities can hardly be considered a sham[.]"); Concourse Nursing, 278 A.D.2d at 35 ("Nor can defendants' efforts on behalf of their client, ultimately successful as they were, be considered a sham[.]")

Moreover, it cannot reasonably be inferred from the factual allegations in the complaint that defendant engaged in any overtly corrupt or illegal conduct. In sum, plaintiff "do[es] not possess [a] cognizable cause[] of action for what amounts to . . . defendant['s] mastery of the

13

local political process to protect [its] legitimate business interests." Alfred Weissman, 268 A.D.2d at 110-11, 707 N.Y.S.2d 647. Since plaintiff's tortious interference claim against defendant is barred by the Noerr-Pennington doctrine, defendant's motion to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure is granted and the complaint is dismissed in its entirety with prejudice for failure to state a claim for relief.[6]

III.   CONCLUSION

For the foregoing reasons, the branch of defendant's motion seeking dismissal of plaintiff's complaint pursuant to the Noerr-Pennington doctrine is granted and the complaint is dismissed in its entirety with prejudice pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim for a relief.

SO ORDERED.

                                                    /s/
                                   Sandra J. Feuerstein
                                   United States District Judge

Dated: November 25, 2015
       Central Islip, New York

---

[6] In light of this determination, it is unnecessary to consider defendant's remaining contentions.